UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CHARLES VINCENT REED,

                    Plaintiff,

          v.

SARAH KARIKO, *et al.*,

                    Defendants.

CASE NO. 3:20-CV-5580-BHS-DWC

REPORT AND RECOMMENDATION

Noting Date: **January 28, 2022**

Plaintiff filed a complaint under 42 U.S.C. § 1983. Dkt. 5. Before the Court is Defendants' motion for summary judgment. Dkt. 37. As discussed below, this motion should be granted.

**INTRODUCTION**

The Court adapts this introduction from its pending Report and Recommendation (R&R) in *Reed v. Hammond et al.*, Case No. 3:16-cv-5993-BHS-DWC ("*Reed I*"), Dkt. 180, which provides background for Plaintiff's complaint in this action, *Reed v. Kariko et al.*, Case No. 3:20-cv-5580-DWC ("*Reed II*").

1          Plaintiff was diagnosed with Hepatitis C ("HCV") in 2012. *Reed I*, Dkt. 180 at 13

2 (citation omitted).[1] Plaintiff had a liver biopsy on June 10, 2014. *Id.* (citations omitted). Plaintiff

3 was transferred to Stafford Creek Correctional Center ("SCCC") in August 2014. *Id.* (citations

4 omitted).[2] The liver biopsy showed a fibrosis score of F2, whose correctness Plaintiff disputed.

5 *Id.* at 13 and n.6 (citations omitted). Liver fibrosis is graded on a scale from F0 to F4 on a

6 METAVIR fibrosis level: "F0" means no scarring; "F1" means mild scarring; "F2" means

7 moderate scarring; "F3" means severe scarring; and "F4" means very severe scarring/cirrhosis.

8 *Id.* at 12 (citation omitted).

9          Plaintiff started seeking treatment for HCV upon transfer to SCCC in August 2014. *Id.* at

10 13 (citation omitted). The HCV protocol calls for annual blood tests to predict the fibrosis level

11 of patients without the need for an invasive liver biopsy. *Id.* (citation omitted). The blood tests

12 are used to calculate an aspartate aminotransferase ("AST") to Platelet Ratio Index ("APRI")

13 score, which provides a non-invasive way to predict fibrosis and cirrhosis in HCV patients

14 without imaging or biopsy. *Id.* at 13–14 (citation omitted).

15          Nurse Eschbach testified that her evaluations did not indicate that Plaintiff's HCV had

16 progressed to an F3 or F4 score because: (1) his APRI scores were relatively low compared to

17 others with higher levels of fibrosis; and (2) his symptoms were inconsistent with HCV

---

[1] All citations to docket entries in *Reed I* start with "*Reed I*" to distinguish them from citations to docket entries in this case (*Reed II*). By contrast, with the exception discussed in the following footnote, citations to docket entries in this case will **not** be preceded by "*Reed II*."

[2] When "*id.*" (or any other signal) follows a citation to a docket entry in *Reed I*, it refers to the docket entry in *Reed I*. By contrast, when "*id.*" (or any other signal) does **not** follow a citation to a docket entry in *Reed I*, it refers to a docket entry in this case (*Reed II*).

extrahepatic[3] manifestations. *Id.* at 14 (citation omitted). Nevertheless, Nurse Eschbach reported Plaintiff's case to the HCV Care Review Committee ("CRC"). *Id.* (citation omitted).

On October 1, 2015, Sara Kariko, a doctor, evaluated Plaintiff and referred his case to the CRC. *Id.* (citation omitted).[4] Dr. Kariko noted the following symptoms: "'Fatigue, Visual Changes, Cough, Shortness of Breath, Palpitations, Hemorrhoids with Bright Red Blood Per Rectum, Constipation, Nausea, Muscle/Joint[] Aches, Easy Bruising, and Anxiety." *Id.* (citations omitted). Dr. Kariko also reported Plaintiff had Barrett's esophagus and recommended an endoscopic surveillance every three to five years. *Id.* (citation omitted). In December 2015, Plaintiff received APRI testing. *Id.* (citations omitted).

To apply the HCV protocol, a specific CRC was created. *Id.* (citation omitted). The CRC was comprised of practitioners who presented or discussed care of patients with HCV. *Id.* at 15 (citation omitted). The CRC discussed each case presented and determined by majority vote whether to defer or prioritize treatment with Direct Acting Anti-virals ("DAAs"). *Id.* (citation omitted).

On January 7, 2016, the CRC determined that Plaintiff did not warrant treatment because he had an F2 fibrosis score and a relatively low APRI that had not significantly changed since his most recently biopsy. *Id.* (citation omitted). The CRC found that the risks of a repeat liver biopsy outweighed the benefits because it would unlikely be significantly different from the previous one. *Id.* (citation omitted). The CRC concluded that Plaintiff did not meet the Department of

---

[3] Merriam-Webster Online Dictionary defines "extrahepatic" as "situated or originating outside the liver." https://www.merriam-webster.com/dictionary/extrahepatic.
[4] For simplicity, the Court hereinafter refers to all CRCs (HCV or otherwise) as "CRC." The distinction is immaterial here.

1   Corrections' ("DOC") criteria for HCV treatment given his lower-moderate fibrosis and no co-

2   morbidity putting him in a high-risk category. *Id.* (citation omitted).

3       In October 2016, the DOC's HCV protocol changed. *Id.* (citations omitted). Under the

4   new protocol, patients with a fibrosis score of F2 or higher were to be given the highest treatment

5   priority for DAAs. *Id.* (citation omitted). After this change, the DOC developed a system to

6   prioritize treatment with DAAs within the F2 population based on APRI scores. *Id.* at 15–16

7   (citations omitted).

8       In January 2017, Plaintiff received another APRI test. In April 2017, Nurse Eschbach

9   evaluated Plaintiff. *Id.* at 16 (citation omitted). On June 20, 2017, Plaintiff received a Fibroscan,

10  which is a technique to evaluate HCV patients for fibrosis and is less invasive than a liver

11  biopsy. *Id.* at 16 (citation omitted). The Fibroscan showed that Plaintiff's HCV infection may

12  have progressed to F4, making Plaintiff a high priority for treatment. *Id.* (citation omitted). In

13  October 2017, the CRC approved Plaintiff for treatment with DAAs, which he received in

14  November 2017. *Id.* (citations omitted).

15                          **COMPLAINT'S ALLEGATIONS**

16      Plaintiff remains incarcerated at SCCC. Dkt. 5 at 2. Plaintiff names the following

17  Defendants: (1) Dr. Kariko, Chief Medical Officer for the DOC;[5] (2) Dr. Lara Strick, Infectious

18  Disease Specialist for the DOC; (3) Dr. Ryan Herrington, Facility Medical Director for SCCC;

19  (4) Jeanette Neibert, Registered Health Information Technician at SCCC; (5) Timothy Taylor,[6]

20

21

22  _____

23      [5] "Dr. Kariko was also the Facility Medical Director at [SCCC] from September 2014 to
    October 2018." Dkt. 37 at 2 (citing Dkt. 38-1 at 4).

24      [6] Plaintiff incorrectly listed Defendant Taylor's first name as "John." Dkt. 37 at 1 n.1.

1  Health Service Manager 1 at SCCC; (6) Nurse Eschbach (retired DOC nurse); and (7) Dr. John

2  D. Kenney,[7] Medical Provider at SCCC. *See id.* at 3–4.

3      In Counts 1–3, Plaintiff alleges that he has certain extrahepatic manifestations of HCV,

4  namely, polycythemia, hyperglycemia, and cryoglobulinemia. *See id.* at 6–9. Plaintiff alleges

5  that each Defendant failed to "monitor" and treat these alleged conditions and failed to refer him

6  to a specialist for each condition. *See id.* Plaintiff also contends that this alleged failure caused

7  him pain and various symptoms. *See id.*

8      In Counts 4–7 and 15, Plaintiff alleges that Defendants Dr. Herrington, Dr. Kenney, and

9  Taylor intentionally discontinued certain medications and a health status report ("HSR"). *See id.*

10  at 10–12. Between October 26, 2018 and February 5, 2019, Plaintiff alleges that these

11  Defendants discontinued: (1) betamethasone valerate ointment ("betamethasone"); (2)

12  hydrocortisone rectal cream ("hydrocortisone"); (3) flunisolide nasal spray ("flunisolide"); and

13  (4) an HSR for Ace knee wraps and a lower bunk. *See id.* Plaintiff further alleges that

14  Defendants discontinued the prescriptions and HSR without examining him or reviewing his

15  medical records. *See id.* Plaintiff allegedly needed the prescriptions and HSR for, respectively:

16  (1) skin conditions; (2) hemorrhoids; (3) eosinophilic esophagitis ("EE");[8] and (4) degenerative

17  knees. *See id.* Plaintiff adds that these discontinuances caused him various medical problems,

18  which respectively include: (1) rashes; (2) rectal inflammation and bleeding; (3) chronic

19  coughing and laryngeal and nasal inflammation; and (4) and knee pain. *See id.*

20

21

22

---

[7] Plaintiff incorrectly spelled Defendant Dr. Kenney's last name as "Kenney."

23  [8] EE "is a chronic, immune/antigen-mediated esophageal disease characterized clinically
by symptoms related to esophageal dysfunction, endoscopic appearance, and histologically by

24  eosinophil-predominant inflammation." Dkt. 38-6 at 19.

1    In Counts 8–14 and 16–18, Plaintiff alleges that Defendants Neibert, Dr. Herrington,

2    Taylor, and Dr. Kenney "failed to properly make, maintain, [and] organize medical records."

3    Dkt. 23 at 3 (citation omitted); *see also* Dkt. 5. at 12–23. Most of the allegations in these Counts

4    overlap. Generally, Plaintiff alleges that these Defendants failed to

5        [provide] progress reports relative to [Plaintiff's HCV] treatment to evidence
         treatment success on those conditions. . . .

6                                           ***
7        1) . . . fill out General Practice Medicine/Encounter Reports . . . ; 2) there are [no]
         Primary Encounter Reports being filled out . . . ; 3) there are no Progress Notes,
         Procedure Notes, or Medical Notes outlining the Reason For Visit, History of
8        Present Illness, Past Medical History, Current Medications, Family History,
         Social History, Ph[y]sical Examination, and Assessment and P[l]an. . . . ; 4) there
9        are no Medicine Consultation Reports outlining Reason for Visit, Problem List,
         Medication List Allergies, Vitals, or Assessment Plan; 5) . . . the  Problem
10       List/Surveillance Report is not being filled out, with its last entry dated February
         10, 2016. . . .

11

12    *See* Dkt. 5 at 22–23 (summarizing allegations at issue in the Counts).

13    Plaintiff alleges that these failures proximately caused "his needlessly suffering years of

14    excruciating pain, cirrhosis of the liver, unusual migraine headaches, energy loss, fatigue, skin

15    conditions, abnormal heart rhythm, prediabetes, [COPD], high anxiety, and other life threatening

16    complications." *See, e.g.*, *id.* at 13, 22.

17    In Count 9, Plaintiff alleges that he was diagnosed with EE in 2008 and prescribed

18    flunisolide in 2011. *Id.* at 14. Plaintiff further alleges that Defendants Neibert and Taylor failed

19    to ensure that his medical records were complete, causing these diagnoses to go missing from his

20    medical file. Consequently, Plaintiff alleges that, in May 2019, he was not "reevaluated" for EE

21    "because there was no documentation" of its diagnosis. *Id.* at 13. Plaintiff further alleges that, in

22    September 2019, a specialist diagnosed him with chronic bronchitis and chronic obstructive

23    pulmonary disease ("COPD") and prescribed him medication, including flunisolide for EE. *Id.* at

24

14. Plaintiff adds that the alleged failure of these Defendants to maintain complete medical records caused this delay in receiving mediation and contributed to his chronic cough and laryngeal inflammation. *Id.*

For the first three groups of Counts (1–18), Plaintiff asserts an Eighth Amendment medical deliberate indifference claim. *See id.* at 5–23. Based on the same allegations, Plaintiff asserts state-law claims for medical malpractice, medical negligence, and violations of the DOC Offender Health Plan ("OHP"), the January 2015 edition of the DOC Health Information Management Protocols ("HIMP"), and Wash. Admin. Code § 137-91-010.  *See, e.g.*, *id.* at 5, 24–25; *see also* Dkt. 43 at 6–177.

In Count 19, Plaintiff alleges that Defendants Dr. Kenney, Dr. Herrington, and Taylor retaliated against him. In support, Plaintiff repeats his allegation that these Defendants failed to keep complete medical records and contends that they so acted because he filed a grievance on January 21, 2016 complaining about the CRC's denial of treatment in the same month. *See* Dkt. 5 at 23–24; *see also Reed I*, Dkt. 8 at 9–11.

In his prayer for relief, Plaintiff seeks extensive injunctive relief, including: (1) referrals to specialists for the conditions alleged in Counts 1 through 3 and other alleged symptoms and conditions; (2) the proper creation of, maintenance, and organization of his medical records; (3) immediate release from incarceration; and (4) unspecified damages. Dkt. 5 at 26–27.

## PROCEDURAL BACKGROUND

Plaintiff filed his complaint on June 18, 2020. *Id.* at 26. Plaintiff filed a motion to compel. Dkt. 30. On June 30, 2021, the Court granted the motion to compel. Dkt. 36. The Court ordered Defendants to, "if they [had] not already done so, . . . respond to Plaintiff's First Set of Discovery Requests on or before July 9, 2021." *Id.* at 2–3. Further, the Court ordered the Parties

"to meet and confer to resolve any future discovery disputes." *Id.* at 3. Additionally, the Court extended the scheduling order as follows: (1) discovery—August 1, 2021; (2) motions to compel—August 17, 2021; and (3) dispositive motions—September 1, 2021. *Id.* at 4. Neither Party filed any discovery-related motions after the Court entered this order.

On September 1, 2021, Defendants filed their motion for summary judgment. Dkt. 37. On September 17, 2021, Plaintiff filed his response. Dkt. 41. Contemporaneously, Plaintiff filed a motion to file overlength brief and a declaration. Dkts. 38, 40.

On September 21, 2021, the Court granted Plaintiff's motion to file overlength brief and struck without prejudice his declaration. Dkt. 44. The Court found that the declaration spanned 126 pages and was essentially a responsive brief. *Id.* at 2. In support, the Court noted that Plaintiff "devote[d] extensive portions of the declaration to analyzing Defendants' evidence rather than setting forth facts pertaining to his medical treatment (or lack thereof) based on his own personal knowledge." *Id.* The Court further noted that, "instead of setting forth facts based on his own personal knowledge, Plaintiff heavily incorporate[d] by reference other individuals' testimony or declarations." *Id.* at 3. Therefore, because "Plaintiff's declaration . . . [was] substantially not based on his personal knowledge and reflect[ed] an end-run around the page limitations of Rule 7 by including legal arguments outside of the brief," the Court stuck it and ordered Plaintiff to file a proper declaration. *Id.* at 3.

On October 13, 2021, Plaintiff filed a Supplemental Declaration. Dkt. 45. Defendants filed a reply on October 29, 2021. Dkt. 46.

**PRELIMINARY MATTERS**

## I.    Whether to Extend the Discovery Deadline and Appoint Counsel

In his response to Defendants' motion for summary judgment, Plaintiff contends that he has "not been provided a single production document outside of each of the [Defendants'] job description." Dkt. 41 at 3 (citation omitted). Further, Plaintiff contends that "the date [he] actually received notice of [the Court's order extending the scheduling order] left [him] short the 30-days [sic] needed in which to further [sic] any discovery request[s] and responses." *Id.* Therefore, Plaintiff contends that he "was denied his opportunity for proper discovery." *Id.* Consequently, Plaintiff asks the Court to deny the motion for summary judgment without prejudice, appoint counsel, and order further discovery. *Id.* at 2.

A scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4); *accord* LCR 16(b)(6). "Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992). "[C]arelessness is not compatible with a finding of diligence," *id.* (citations omitted), and the "[m]ere failure to complete discovery within the time allowed does not constitute good cause for an extension," LCR 16(b)(6). "Moreover, where a motion is made to extend [the discovery] deadline after the deadline has expired, the movant must show excusable neglect." *Hammer v. City of Sun Valley*, No. 1:13-CV-211-EJL, 2018 WL 3973400, at *4 (D. Idaho Aug. 20, 2018) (citing Fed. R. Civ. P. 6(b)(1)(B)).

Here, the Court denies Plaintiff's request to extend the discovery deadline. Plaintiff has not explained why he failed to move to further extend the discovery deadline before it expired. Furthermore, Plaintiff's allegation that he did not receive the Court's order extending the discovery deadline is conclusory and factually unsupported. Plaintiff is a prisoner E-filer and has

1  received the Court's other orders in this case. Therefore, absent more, the Court cannot infer that

2  he did not timely receive the order extending the discovery deadline.

3         The Court also denies Plaintiff's request for counsel. Plaintiff did not make the request in

4  a separate motion. Furthermore, Plaintiff has not set forth any reasons that the Court should

5  appoint counsel, apart from the prospect of conducting further discovery. *See* Dkt. 41 at 2–3. But

6  the Court denied Plaintiff's request to extend the discovery deadline, so this reason is no longer

7  valid.

8         **II.    Whether to Strike Plaintiff's Supplemental Declaration**

9         In Defendants' reply to Plaintiff's response to their motion for summary judgment, they

10  contend that the Supplemental Declaration "is replete with the same sorts of problems associated

11  with his first declaration." Dkt. 46 at 1. Defendants ask the Court to "strike those portions of

12  [Plaintiff's] Supplemental Declaration that are not statements of fact based on [Plaintiff's]

13  personal knowledge." *Id.* at 2. Alternatively, Defendants ask "the Court to refuse to consider any

14  portions of [Plaintiff's] Supplemental Declaration that are not statements of fact . . . based upon

15  [Plaintiff's] personal knowledge." *Id.*

16         The Court has reviewed the Supplemental Declaration and agrees that it contains

17  numerous statements that are not based on Plaintiff's personal knowledge, including expert

18  testimony that Plaintiff has incorporated and Plaintiff's own medical opinion. Because Plaintiff

19  intersperses the Supplemental Declaration with these impermissible statements, striking the

20  impermissible portions would be impracticable. Rather, as Defendants alternatively propose, the

21  Court will not consider the impermissible portions when ruling on Defendants' motion for

22  summary judgment.

23

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

### III.    Whether to Consider Evidence from Dr. Gish

Dr. Gish is Plaintiff's expert medical witness in *Reed I. See, e.g.*, *Reed I*, Dkt. 180 at 35 n.14. Plaintiff relies extensively on Dr. Gish's declaration and deposition testimony. Defendants state that Dr. Gish "is not an expert in this case." Dkt. 46 at 6. However, Defendants do not explain what they mean by this. Defendants may mean that Plaintiff did not disclose Dr. Gish as an expert, and/or that Dr. Gish did not submit an expert report, in violation Federal Rule of Civil Procedure 26(a)(2). But Defendants have not moved to strike or exclude this evidence under Federal Rule of Civil Procedure 37(c)(1). Furthermore, Dr. Gish testified that his declaration was his expert report. *See* Dkt. 43 at 294. Additionally, assuming Plaintiff failed to comply with Rule 26(a)(2), Plaintiff could potentially show that this "failure was substantially justified or [] harmless." *See* Fed. R. Civ. P. 37(c)(1). In these circumstances, it is appropriate to consider Dr. Gish's evidence when ruling on Defendants' motion for summary judgment.

### SUMMARY JUDGMENT STANDARD

Summary judgment is only proper where the materials in the record show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a), (c). "A 'material' fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citation omitted). A disputed material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and internal quotation marks omitted).

1    When reviewing a motion for summary judgment, the court must believe the nonmoving

2    party's evidence and draw all reasonable inferences in his or her favor. *T.W. Elec. Serv.*, 809

3    F.2d at 630–31. Also, the court must avoid weighing conflicting evidence or making credibility

4    determinations. *Id.* at 631.

5    "A summary judgment motion cannot be defeated by relying solely on conclusory

6    allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989)

7    (citation omitted). "Likewise, mere . . . speculation do[es] not create a factual dispute for

8    purposes of summary judgment." *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir.

9    1996) (citation omitted). Moreover, "[a] mere scintilla of evidence supporting the non-moving

10    party's position is insufficient[ to survive summary judgment]." *Rivera v. Philip Morris, Inc.*,

11    395 F.3d 1142, 1146 (9th Cir. 2005) (citation omitted).

12    **EIGHTH AMENDMENT (MEDICAL DELIBERATE INDIFFERENCE)**

13    **I.    Counts 1–3: Medical Deliberate Indifference (Alleged Against Each**

14    **Defendant)**

15    A.    Plaintiff's Evidence

16    Plaintiff relies heavily on the declaration and deposition testimony of Dr. Gish to support

17    his argument that Defendants were deliberately indifferent to the extrahepatic manifestations

18    alleged in these Counts.

19    Pertinently, Dr. Gish declares:

20    All patients with hepatitis C should be fully evaluated for extrahepatic disease
      symptoms and signs. All experienced physicians should be able to identify
21    extrahepatic disease symptoms and signs and complete a work up, including a
      rheumatoid factor and assessment for kidney, nerve and other tissue damage. Mr.
22    Reed's assessments for extrahepatic symptoms were inadequate and fell below the
      standard of care.

23

24

1    Mr. Reed showed signs of extrahepatic symptoms that were not adequately
2    evaluated by his medical providers. It is likely that he had these extrahepatic
     symptoms, and failing to do appropriate lab work to determine whether or not he
3    did was an unsound medical decision that fell below the standard of care. In 2014
     and 2017, Mr. Reed had blood laboratory evidence of hyperglycemia (diabetes or
     prediabetes), a known systemic associated medical issue related to hepatitis C.
4    Mr. Reed has a family history of diabetes placing him at higher risk of diabetes as
     well as the HCV infection. Mr. Reed also had elevated serum globulins indicating
5    an inflammatory systemic condition related to hepatitis C in 2017 and probably
     had cryoglobulinemia by inference; he should have had an assessment for
6    cryoglobulinemia with a rheumatoid factor and if positive, testing for serum
     quantitative cyroglobulins. It is more likely than not that the cryoglobulin problem
7    predated 2017. Based on the records I have seen, Mr. Reed did not have an
     assessment for cryoglobulinemia or testing for serum quantitative cyroglobulins.
8    Mr. Reed had an elevated hematocrit on December 5, 2017. This finding supports
     the diagnosis of polycythemia which has been reported in association with
9    hepatitis C as a systemic condition. Mr. Reed should have been evaluated for
     polycythemia. Based on my review of Mr. Reed's medical records, it does not
10   appear he was ever evaluated for polycythemia. The only sound medical decision
     under these circumstances would have been to test Mr. Reed for these
11   extrahepatic diseases, particularly given that DOC's treatment protocol apparently
     used the presence of extrahepatic symptoms as a criteria for whether treatment
12   was indicated.

13   *Reed I*, Dkt. 164-5 at 22–23.

14          Pertinently, Dr. Gish testifies that:

15          •       In August 2017, Plaintiff's blood sugar of 104 indicated hyperglycemia. Dkt. 43

16   at 278. However, his A1C value was "inclusive of prediabetic or nondiabetic." *Id.* at 277.

17          •       In August 2017, Plaintiff's hematocrit value was not outside the normal range and

18   did not cause Dr. Gish any concerns. *Id.* at 279. If a patient had polycythemia as an extrahepatic

19   manifestation of HCV, Dr. Gish would expect the patient to have "more than one lab report

20   indicating elevated hematocrit." *Id.* at 291.

21          •       In August 2017, Plaintiff's globulin reading was elevated. *Id.* at 290–91.

22   Plaintiff's elevated globulin reading was a substantial concern because seventy percent of

23   hepatitis C patients have cryoglobulinemia, which is a disease that can "injure almost any organ

24

1    in the body." *Id.* at 278. Dr. Gish's clinical assessment was that Plaintiff had cryoglobulinemia

2    "as far back as 2012." *Id.* at 284. Dr. Gish based this diagnosis on "a variety of somatic

3    symptoms," including arthritis, lichen planus (type of rash), and fatigue. *Id.* Lichen planus "has

4    an extremely high probable association with hepatitis C." *Id.* If Dr. Gish had "a patient with

5    hepatitis C and lichen planus and arthritis and a rash and fatigue and muscle pain, nerve pain, a

6    cryoglobulinemia workup would be done." *Id.* It is highly probable that "physicians who are not

7    liver specialists would identify cryoglobulinemia as something for which [Plaintiff] needed to be

8    evaluated[.]" *Id.*

9           •      "The treatment for cryoglobulinemia is hepatitis C treatment." *Id.* at 279. This

10    "resolves the cryoglobulinemia in the majority of patients and presents the development in many

11    patients of cancer or other downstream events from the cryoglobulinemia." *Id.* The DAAs

12    Plaintiff received were appropriate to treat his HCV and obtained a cure, i.e., a sustained

13    virologic response ("SVR"). *Id.* at 280.

14           •      Plaintiff "need[ed] a full workup of cryoglobulinemia and all the associated

15    diseases such as lymphoma [and to be] monitored for the 13 other systemic diseases that are

16    associated with hepatitis C, such as prostate cancer, thyroid disease, [and] ocular injury, just to

17    list a few." *Id.* at 296.

18           B.     Defendants' Evidence

19           **(1)    Defendant Dr. Kariko**

20           •      "Dr. Kariko was [] the Facility Medical Director ['FMD'] at [SCCC] from

21    September 2014 to October 2018." Dkt. 37 at 2 (citing Dkt. 38-1 at 4). "As FMD of SCCC, some

22    of [her] duties included: oversight of medical practitioners; co-leader of the local quality

23    improvement program; [and] participating in statewide leadership meetings." Dkt. 38-1 at 4.

24

1  Defendant Dr. Kariko "became Chief Medical Officer ['CMO'] for the [DOC] on October 1,

2  2018. Some of [her] duties included: providing direct clinical oversight of lead physicians at

3  each facility; developing and updating policies and procedures to administer effective and

4  efficient standards of care; providing updates to the DOC Health Plan." *Id.* at 3.

5  •       Plaintiff states that he "had an elevated hematocrit of 50.3 (41 – 50) on May 20,

6  2020, and 50.3 . . . on December 5, 2017." *Id.* at 4. In response, Defendant Dr. Kariko states that

7  Plaintiff was not diagnosed with polycythemia and that, therefore, "there was no indication to

8  refer him to Hematologist for treatment." *Id.* at 5. Likewise, she states that, because Plaintiff was

9  not diagnosed with diabetes, prediabetes, or cryoglobulinemia, there was no need for treatment

10  of these conditions or a referral to a specialist. Dkt. 38-1 at 5–7.

11  •       Defendant Dr. Kariko also states that she was not Plaintiff's "primary care

12  provider and [was] not in the position to evaluate, monitor or communicate lab results with

13  individual patients." *Id.* at 10. "This also applies to referring patients to specialists." *Id.*

14  **(2)     Defendant Dr. Herrington**

15  •       Since July 2017, Defendant Dr. Herrington has served as FMD at SCCC. *See* Dkt.

16  38-2 at 3–4. As FMD, he does "not usually have primary care responsibility for patients." *Id.* at

17  4.

18  •       In response to Plaintiff's assertion that he had elevated hematocrit in December

19  2017 and May 2020, Defendant Dr. Herrington states that it "is not uncommon for laboratory

20  results to be mildly out of range, and a physician would need to figure out whether this is

21  significant from a clinical perspective." *Id.* at 4. "Elevated hematocrit levels, alone, are not

22  sufficient to make a diagnosis." *Id.*

23

24

1    •    In response to Plaintiff's assertion that he was hyperglycemic in 2014 and 2017,

2    Defendant Dr. Herrington states that "individual glucose readings that were elevated would not

3    necessarily be significant" because, for instance, "blood glucose levels can be significantly high

4    if the blood sample . . . is taken right after the patient has eaten a meal." *Id.* at 5. Also,

5    "[h]emoglobin A1C, which is a measure of glucose levels over a period of 3 months, is much

6    more useful for purposes of diagnosing diabetes or prediabetes." *Id.* "Further, a patient who is

7    diagnosed as prediabetic or diagnosed with Type II diabetes need not necessarily be referred to a

8    specialist at all." *Id.* at 6.

9    •    In response to Plaintiff's assertion that he had elevated serum globulins in

10   December 2017 and January 2018, Defendant Dr. Herrington states that the "DOC Hepatitis

11   Program is overseen by an infectious disease physician, not [him]." *Id.* at 7. He adds that "there

12   is no specialist 'in the area of cryoglobulinemia'; rather, there are a variety of medical specialists

13   that could treat cryoglobulinemia, a condition with which Mr. Reed was never diagnosed." *Id.*

14       **(3)    Defendant Dr. Strick**

15   •    Defendant Dr. Strick states that she "provide[s] infectious disease consultation to

16   the providers in [DOC] and see[s] patients with or suspected of having an infectious disease

17   upon request of their primary practitioner." Dkt. 38-4 at 3. She further states: "I coordinate and

18   manage the Hepatitis C Treatment Program . . . . I oversee the [DOC] Infection Prevention

19   Program . . . ." *Id.*

20       •    In response to Plaintiff's assertion that he had elevated hematocrit in December

21   2017 and May 2020, Defendant Dr. Strick states that she "did not have a role in the clinical

22   management of Mr. Reed other than [her] participation in the Hepatitis CRC discussion on

23   1/7/2016 and 10/12/2017 and helping to monitor his antiviral treatment for Hepatitis C once it

24

1   was initiated." Dkt. 38-4 at 4. The lab tests referenced were obtained after the Hepatitis C CRC

2   discussion took place." *Id.*

3        •      In response to Plaintiff's assertion that he had hyperglycemia in 2014 and 2017,

4   Defendant Dr. Strick repeats that she did not have a role in Plaintiff's clinical management apart

5   from the CRC meetings and states that, "[d]uring those discussions, there was no clinical or

6   laboratory concern for pre-diabetes or diabetes." *Id.* at 5.

7        •      In response to Plaintiff's assertion that he had elevated serum globulins in

8   December 2015 and January 2018, Defendant Dr. Strick states she was not aware of his globulin

9   levels during the CRC's discussions and that "Hepatitis C infection can cause elevated globulin

10   levels in the absence of cryoglobulinemia." *Id.* at 6.

11       **(4)**    **Defendant Nurse Eschbach**

12        •      Defendant Nurse Eschbach states that, from August 2014 to December 2018, she

13   was an Infection Control Nurse at SCCC. Dkt. 38-5 at 3. In response to Plaintiff's assertion that

14   he was hyperglycemic in 2014 and 2017, she states that, as "an Infection Control Nurse, [she]

15   would not normally be involved with care for hyperglycemia (diabetes) because it is not an

16   infectious disease." *Id.* at 5.

17        •      In response to Plaintiff's assertion that he had elevated serum globulins in

18   December 2015, October 2017, and February 2017, Defendant Nurse Eschbach states: "As a

19   registered nurse and infection control nurse, I am not authorized to make diagnoses, make

20   referrals to specialists, or order laboratory or other diagnostic tests. I can refer a patient to their

21   primary care provider." *Id.* at 6. She adds: "As I recall, Mr. Reed regularly saw his primary care

22   provider. He often sent 'kites' asking for callouts to discuss his concerns and care, and I would

23   respond to his kites and arrange for his callouts." *Id.* at 11.

24

1    **(5)    Defendant Dr. Kenney**

2    •    Defendant Dr. Kenney states that he was "Medical Provider . . . at [SCCC] . . .

3    between September of 2018 and June 2019." Dkt. 38-6 at 3. In response to Plaintiff's assertion

4    that he had elevated hematocrit in December 2017, Defendant Dr. Kenney states that Plaintiff's

5    "hematocrit was slightly elevated at 50.3% (normal range is 41–50%)." *Id.* at 4. He further

6    states: "The patient received several additional blood counts, all of which showed hematocrit

7    values within the normal range—on January 4, 2018 (48.4), February 15, 2018 (47.3), May 3[,]

8    2018 (49.9), August 8[,] 2018 (47.0), and September 4[,] 2018 (47.8). A review of prior records

9    also showed normal hematocrit values in October 24, 2017 (46.7), August 10, 2017 (48.1), and

10   January 7, 2016 (45.2). Being that all 5 follow up hematocrit counts after December 2017 were

11   normal, the one reported minimally elevated . . . value . . . could have more likely [been] due to

12   dehydration or stress at the time the sample was obtained, or due to a lab error (which is not

13   uncommon), rather than a diagnosis of polycythemia. The follow up lab tests . . . were

14   appropriate . . . . [N]o further actions, investigations for polycythemia, treatments or referrals

15   were indicated at that time." *Id.* at 4–5.

16   •    In response to Plaintiff's assertion that he was hyperglycemic in 2014 and 2017,

17   Defendant Dr. Kenney states that he was Plaintiff's medical provider from September 2018 to

18   June 2019. *Id.* at 5–6. Further, he states that Plaintiff's records showed normal glucose levels in

19   the August 2017, January 2017, August 2018, and October 2018. *Id.* at 6. He adds: "Despite

20   normal glucose and glycosylated hemoglobin levels, the patient received routine instructions

21   regarding diet and exercise during his chronic care hypertension visit on October 4, 2018. As

22   there was no abnormality of glucose metabolism . . . , in my opinion, at that time no further

23

24

1   action, investigation, treatment or specialist referral was indicated beyond the routine care that

2   was provided." *Id.*

3          •        In response to Plaintiff's assertion that he had elevated serum globulins,

4   Defendant Dr. Kenney states: "[T]hough there had been a mild elevation of serum globulins in

5   2015 and 2017 (which predated my care), the serum globulin levels had subsequently been stable

6   and normal—on February 15, 2018 (3.4), May 3, 2018 (3.4), and September 4, 2018 (3.4).

7   During the timeframe of my care, there was no record of this patient having verbalized

8   complaints compatible with symptoms of cryoglobulinemia. Consistent with the recent three

9   normal serum globulin levels and no verbalized complaints that would be compatible with

10  cryoglobulinemia symptoms, including complaints of arthralgia, purpura, skin ulcers,

11  glomerulonephritis or peripheral neuropathy, and no recorded manifestations of disease (i.e.

12  fever, fatigue), in my opinion, during the 9-month time of my care there was no clinical

13  indication for further investigation, treatment or referral regarding the concern of potential

14  cryoglobulinemia based solely on mildly elevated serum globulin levels that had been recorded

15  years prior (with the recent levels being normal)." *Id.* at 7–8.

16         **(6)    Defendant Taylor**

17         Defendant Taylor "worked as the Health Care Manager 1 at [SCCC] from February 2019

18  through December 2019." Dkt. 38-7 at 3. He had an "administrative role" and did "not determine

19  what the provider addresses while with the patient." *Id.* at 5.

20         C.      Legal Analysis

21         To prevail on an Eighth Amendment claim predicated on the denial of medical care, a

22  plaintiff must show that: (1) he had a serious medical need; and (2) the defendant's response to

23  the need was deliberately indifferent. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006); *see*

24

1  *also Estelle v. Gamble*, 429 U.S. 97, 106 (1976). To establish a serious medical need, the

2  plaintiff must show that the "failure to treat [the] . . . condition could result in further significant

3  injury or the unnecessary and wanton infliction of pain." *Jett*, 439 F.3d at 1096 (citation

4  omitted). "The existence of an injury that a reasonable doctor or patient would find important

5  and worthy of comment or treatment; the presence of a medical condition that significantly

6  affects an individual's daily activities; or the existence of chronic and substantial pain are

7  examples of indications that a prisoner has a 'serious' need for medical treatment." *McGuckin v.*

8  *Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc.*

9  *v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997).

10      Here, the Court assumes that Plaintiff's alleged extrahepatic manifestations of HCV,

11  namely, polycythemia, hyperglycemia, and cryoglobulinemia, constitute objectively serious

12  medical needs. So the issue is whether Defendants were deliberately indifferent to them.

13      For a prison official's response to a serious medical need to be deliberately indifferent,

14  the official must "'know[] of and disregard[] an excessive risk to inmate health.'" *Peralta v.*

15  *Dillard*, 744 F.3d 1076, 1082 (9th Cir. 2014) (en banc) (quoting *Farmer v. Brennan*, 511 U.S.

16  825, 837 (1994)). "[T]he official must both be aware of facts from which the inference could be

17  drawn that a substantial risk of serious harm exists, and he must also draw the inference."

18  *Farmer*, 511 U.S. at 837.

19      It is well-established that "a mere difference of medical opinion . . . [is] insufficient, as a

20  matter of law, to establish deliberate indifference." *See, e.g.*, *Toguchi v. Chung*, 391 F.3d 1051,

21  1058 (9th Cir. 2004) (alterations in original) (citation omitted). This rule applies whether the

22  difference is between the medical professional(s) and a prisoner or two or more medical

23

24

1  professionals. *See, e.g.*, *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016) (citation

2  omitted).

3        Non-medical prison officials may be deliberately indifferent to medical needs by

4  "intentionally denying or delaying access to medical care or intentionally interfering with the

5  treatment once prescribed." *See Estelle*, 429 U.S. at 104–05. But an "inadvertent or negligent

6  failure to provide adequate medical care alone does not state a claim under § 1983." *Jett*, 439

7  F.3d at 1096 (alteration adopted) (citation and internal quotation marks omitted). Furthermore,

8  mere delays in a prisoner's medical treatment do not constitute deliberate indifference unless

9  they cause the prisoner further harm and the defendants know this to be the case. *See Hallett v.*

10  *Morgan*, 296 F.3d 732, 746 (9th Cir. 2002) (citation omitted).

11        Here, a reasonable juror could not conclude that Defendants were deliberately indifferent

12  to the alleged extrahepatic manifestations at issue. Plaintiff relies almost exclusively on Dr.

13  Gish's opinions to support his argument. However, Dr. Gish testified that the "treatment for

14  cryoglobulinemia is hepatitis C treatment." Dkt. 43 at 279. Dr. Gish further testified that the

15  DAAs Plaintiff received were appropriate to treat his HCV and that he obtained an SVR. *Id.* at

16  280. Likewise, Plaintiff states that he experienced "improvements" in various symptoms after he

17  obtained an SVR. Dkt. 45 at 5.

18        Defendant Dr. Kenney states that, based on several normal readings for hematocrit,

19  glucose, and serum globulins, no further investigation, treatment, or referral was warranted for

20  the alleged extrahepatic manifestations at issue. Plaintiff does not agree with this assessment and

21  notes that he had elevated hematocrit and glucose levels as late as March 2020. Dkt. 43 at 180.

22  Plaintiff also notes that, in January 2008, Defendant Dr. Strick wrote, without explanation, "Pre-

23  diabetes" on procedure notes. Dkt. 51 at 102–05. Again, however, Defendant Dr. Kenney

24

acknowledged that Plaintiff had high readings for the above variables on certain occasions.
Furthermore, Defendant Dr. Herrington states that "[h]emoglobin A1C, which is a measure of
glucose levels over a period of 3 months, is much more useful for purposes of diagnosing
diabetes or prediabetes." Dkt. 38-2 at 6. In August 2017 and March 2020, Plaintiff's hemoglobin
A1C reading was 5.5, which was "nondiabetic" according to Plaintiff's providers and guidelines
of the American Diabetes Association. *See* Dkt. 43 at 180, 277. Although Dr. Gish opines that
Plaintiff's 5.5 reading was "inclusive of prediabetic or nondiabetic," Defendant Dr. Herrington
states that a patient "who is diagnosed as prediabetic or diagnosed with Type II diabetes need not
necessarily be referred to a specialist at all." Dkt. 38-2 at 6.

True, Dr. Gish generally disagrees with Dr. Kenney's conclusion that Plaintiff's alleged
extrahepatic manifestations did not warrant further treatment. But there is no clear indication in
Dr. Gish's declaration or testimony that he considered Plaintiff's medical records after December
2017. So Dr. Gish's evidence does not necessarily contradict Dr. Kenney's opinion that
Plaintiff's complete medical history did not indicate the need to further investigate or treat the
extrahepatic manifestations at issue. And, even if it did, whether further investigation or
treatment was warranted would be a mere difference in medical opinion, which does not amount
to deliberate indifference.

Plaintiff states that he continues to experience a variety of symptoms, including: "muscle
spasms, energy loss, fatigue, dizziness, skin conditions, joint pain, abdominal pain[,]" migraine
headaches, and blurred vision. Dkt. 41 at 11, 20; Dkt. 45 at 5. Furthermore, Plaintiff contends
that the March 2020 lab report showed elevated cholesterol, urea nitrogen, and carbon dioxide.
Dkt. 43 at 180. Additionally, Plaintiff alleges that February 2020 X-rays revealed "severe neck
degeneration evidencing damage to [his] Cervical Spine." *Id.* at 7 (citing Dkt. 43 at 188).

1    Moreover, Plaintiff asserts that Defendants failed to "follow post-hepatitis C health planning

2    recommend by . . . Dr. Gish." Dkt. 41 at 29–30. Plaintiff adds that Defendant Dr. Kenney

3    "withdrew [his] request for [a] CT scan." *Id.* at 13.

4              In making these arguments, Plaintiff raises new theories of relief in his response to

5    Defendants' motion for summary judgment, which is generally impermissible. *See Patel v. City*

6    *of Long Beach*, 564 F. App'x 881, 882 (9th Cir. 2014) (citation omitted). Assuming these new

7    theories of relief are properly before the Court, no reasonable juror could conclude that

8    Defendants were deliberately indifferent to these symptoms and requests. The record is replete

9    with medical records showing that a variety of prison officials were evaluating and treating

10   Plaintiff for a variety of medical conditions and symptoms. For instance, Defendant Dr. Kenney

11   states that, during the 9-month timeframe in which he was Plaintiff's primary care provider,

12   Plaintiff received: (1) a one-year rectal prescription renewal; (2) referral to the hypertension

13   clinic and completion of lab tests, though Plaintiff declined high blood pressure medication; (3)

14   an ultrasound to monitor potential hepatocellular carcinoma; (4) HSR renewals; (5) an

15   esophagogastroduodenoscopy ("EGD") and new protein pump inhibitor medication; (6)

16   optometry referral; (7) appointment with an infectious disease specialist; (8) renewal of his

17   prescription for constipation and adding a new prescription; and (9) topical medication for a rash.

18   Dkt. 38-6 at 13–14; *see also* Dkt. 43 at 179–200 (medical records showing that, in the 2016 to

19   2021 period, Plaintiff received several blood tests, at least two ultrasounds, X-rays of his cervical

20   spine and knees, and a referral to an ENT specialist), 212–18 (treatment notes stating that

21   medical personnel referred him to outside specialists, considered his requests for a cancer

22   biopanel marker, scheduled a colonoscopy, renewed prescriptions, and scheduled provider

23   appointments). Furthermore, as the R&R found in *Reed I*, Defendant Nurse Eschbach presented

24

Plaintiff's symptoms to the CRC. Although Plaintiff and Dr. Gish may disagree with Defendants' response to their presentation, these mere differences of opinion do not constitute deliberate indifference. Nor does any failure to order their preferred diagnostic tests or treatment modalities violate the Eighth Amendment. *See Estelle*, 429 U.S. at 107 ("[T]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.").

In sum, even assuming that each Defendant was personally involved in Plaintiff's medical care, no reasonable juror could conclude that (s)he was deliberately indifferent to the extrahepatic manifestations and symptoms at issue. As a result, summary judgment should be granted to Defendants on Plaintiff's medical deliberate indifference claim alleged in Counts 1–3.

## II.    Counts 4–7 and Count 15: Medical Deliberate Indifference (Alleged Against Defendants Herrington, Kenney, and Taylor)

In Counts 4–7 and 15, Plaintiff alleges that Defendants Dr. Herrington, Dr. Kenney, and Taylor intentionally discontinued certain medications and a health status report ("HSR"). *See* Dkt. 5 at 10–12. Between October 26, 2018 and February 5, 2019, Plaintiff alleges that they discontinued: (1) betamethasone; (2) hydrocortisone; (3) flunisolide nasal spray; and (4) an HSR for Ace knee wraps and a lower bunk. *See id.* Plaintiff further alleges that they discontinued the prescriptions and HSR without examining him or reviewing his medical records. *See id.*

### A.    Plaintiff's Evidence

•      In 2008, Plaintiff's medical provider suspected that he had "esophagitis." *Reed I*, Dkt. 51 at 104. Plaintiff may have been diagnosed with EE in 2008. *See* Dkt. 43 at 225. The CRC

diagnosed Plaintiff with EE in 2011 and prescribed flunisolide. *See Reed* I, Dkt. 51 at 119; Dkt. 43 at 223.[9]

• In late 2008, Plaintiff had surgery on a torn right ACL. *See id.* at 114–15; *Reed I*, Dkt. 51-1 at 8.

• As early as January 2014, Plaintiff received an HSR for a lower bunk. *Reed* I, Dkt. 51-1 at 6.

• In December 2016, an X-ray revealed that Plaintiff had "mild degenerative changes in the right knee joint lateral compartment with mild spurring of the medial and lateral tibial eminence." Dkt. 43 at 199. The X-ray further revealed "[m]inimal degenerative change" in the left knee. *Id.*

• Plaintiff has a history of rashes dating to at least 2005. *See, e.g.*, *Reed I*, Dkt. 51 at 99, 104, 110; Dkt. 43 at 284.

• In a kite dated October 26, 2018, Plaintiff requested refills of betamethasone and hydrocortisone. Dkt. 43 at 266.

• In a kite dated December 9, 2018, Plaintiff again requested these medications. *Id.* at 261. On December 11, 2018, Defendant Dr. Kenney responded that an appointment would be scheduled within two months. *Id.*

• In a kite dated January 6, 2019, Plaintiff requested a refill of "Fluocinonide 0.05%." *Id.* at 259.[10] And he again asked for betamethasone and hydrocortisone. *Id.* On January

---

[9] Whether Plaintiff was officially diagnosed with EE in 2008 or 2011 is immaterial to the analysis.

[10] *In re Generic Digoxin & Doxycycline Antitrust Litig.*, 222 F. Supp. 3d 1341, 1343 (U.S. Jud. Pan. Mult. Lit. 2017) ("[F]luocinonide [is a] topical corticosteroid[] prescribed for skin conditions.").

15, 2019, Defendant Dr. Kenney responded that an appointment would be scheduled within one month. *Id.*

• In a kite dated January 9, 2019, Plaintiff stated that he requested renewal of his HSR on January 1, 2019. *Id.* at 258. On January 15, 2019, Defendant Dr. Kenney responded that an appointment was pending.

• On January 14, 2019, Plaintiff filed a grievance in which he contended that the prescriptions (including "Fluocinonide 0.05%") and HSR were not renewed starting October 26, 2018. Dkt. 43 at 339. On January 29, 2019, in a first-level grievance, Plaintiff reiterated his complaint. *Id.* at 338. On February 11, 2019, the grievance coordinator noted that he and Defendant Taylor investigated the grievance. *Id.* Further, the grievance coordinator stated that Defendant Dr. Kenney saw Plaintiff on February 5, 2019. *Id.*

• Defendant Dr. Kenney saw Plaintiff on February 5, 2019. *Id.* at 213. The treatment note says: "Angry and demanding. Plenty of attitude. Wants previously prescribed meds and HSR renewed. Has no medical complaints but threatens that his pursuit of what he considers necessary will be relentless. No exam. Renewed meds/HSR per CUS/OMNI." *Id.*

• On February 19, 2019, Plaintiff appealed to the second level. *Id.* at 337. Plaintiff stated that his "HSR's and medication[] prescriptions have all been renewed, except for Flunislide [sic] Nasal Spray." *Id.*

• On July 23, 2019, the superintendent denied the appeal. *Id.* The superintendent stated that the "DOC [was] not obligated to execute" specialists' recommendations and that the primary care practitioner's "responsibility" was to "evaluate the appropriateness and necessity of the recommendations." *Id.* The superintendent further stated that Plaintiff was "seen by Dr. Kenney on October 4, 2018, February 5 and May 16, 2019, who made his determinations for

1   [his] care." *Id.* The superintendent added: "You were most recently seen by . . . Dr. Herrington[]

2   on June 20, 2019, who addressed your concerns and made his medical determination . . . for his

3   recommended treatment plan." *Id.*

4   •       On July 23, 2019, Plaintiff appealed to the third level. *Id.* at 334. On September

5   30, 2019, the assistant secretary denied the appeal, reasoning:

> You requested refills of your hydrocortisone cream and
> betamethasone ointment on 10/26/18 via kite, and were advised the
> first medication was refilled and the betamethasone was in the
> process of being refilled—your order for that medication expired
> 10/30/18. While you received the hydrocortisone, the
> betamethasone order expired. You submitted a kite on 11/27/18
> and were advised that you would be scheduled to see a practitioner.
> During this time you submitted one additional kite regarding your
> ointment on 12/09/19. The medication was not renewed, and you
> were against advised you would be scheduled to see the
> practitioner. You had also been scheduled for several off-site
> visits, and as a result [were] not seen by a practitioner until
> 02/05/19, at which time the betamethasone was renewed by Dr.
> Kenney. At this time all requested medications are current.
>
> On 01/01/19[,] you requested a renewal of your HSRs for Ace
> wraps and a lower bunk. You were notified that you would be
> scheduled for an HSR evaluation with your practitioner. You kited
> again on 01/09/19. This request was also addressed during the
> appointment . . . .
>
> There was a delay between your request for medication renewal
> and your February visit with Dr. Kenney, however[,] this was in
> part due to your pre-scheduled off-site appointments. Dr. Kenney
> had previously seen you in 2018, however[,] the appointments
> were specific to another medical concerns, and these medications
> were not discussed. Your medications have been renewed, as well
> as your requested HSRs.

21  *Id.* at 334, 336.

1    B.    Defendants' Evidence

2    **(1)    Defendant Dr. Kenney**

3    •    Defendant Dr. Kenney states: "No steroid ointment medications were withheld by

4    me for this patient's care during the October 2018 through February 2019 timeframe . . . . No

5    record was located of a concern communicated by this patient to me during the time of my care

6    (September 2018 to June 2019), regarding 'aggravating rashes' on his arms, legs, and face

7    between October 2018 and February 2019." Dkt. 38-6 at 16–17. He further states: "There is one

8    record on May 16, 2019 (outside of the period under discussion) of a visit for a minor rash just

9    below the knee . . . with scaling but no surrounding inflammation. The patient's request was to

10   stop his topical medications and take a pill. As the rash was very localized and mild, systemic

11   medication was not clinically indicated; the patient was advised and managed with continuation

12   of his topical ointment for localized treatment, and monitoring of his condition." *Id.*

13   •    He further states: "No medications were withheld by me for this patient's care of

14   his rectal issues during the October 2018 through February 2019 timeframe . . . . The patient's

15   concerns regarding his rectal issues were discussed at the February 5, 2019 visit; continuation of

16   his medications was ordered, as requested." *Id.* at 18.

17   •    Defendant Dr. Kenney states: "No medications were withheld by me for this

18   patient's care of his [EE] during the October 2018 through June 2019 timeframe . . . . Regarding

19   the management of his ongoing [EE], this patient's medications were continued by me February

20   5, 2019 for one year as requested." *Id.* at 19. He further states: "[Plaintiff's] upper endoscopy

21   biopsy results (January 28, 2019) do not endorse a definitive diagnosis of [EE]. . . . However,

22   treatment was recommended by the ENT specialist in his consultation. Based on Plaintiff's

23   historic [EE] diagnosis (reviewed by Care Review Committee May 5, 2011), he was prescribed

24

Flunisolide as recommended by the ENT consultant. . . . [Plaintiff's] request for an ENT referral [on] May 19, 2019 was deferred to Dr. Herrington, as he was going to assume ongoing care [upon Defendant Dr. Kenney's June 2019 departure]." *See id.* at 19–20.

• He adds: "HSRs were not withheld by me for this patient during the October 2018 through February 2019 timeframe . . . . On February 5, 2019[,] all HSRs for this patient were renewed as requested for one year." *Id.* at 21.

**(2)    Defendant Dr. Herrington**

• Defendant Dr. Herrington states that he has no recollection of being directly involved with Mr. Reed's betamethasone, hydrocortisone, flunisolide, or HSRs. Dkt. 38-2 at 14–15, 17–18. He further states that Defendant Dr. Kenney did not discontinue them and suspects that there may have been orders that expired. *Id.* Additionally, he states that, when "an inmate [has] a prescription that they are able to self-administer, we expect they will let their primary care provider know when they need a re-fill." *Id.* at 14. Likewise, he states that there "is no process for alerting a provider that an HSR is expiring other than an inmate alerting their primary care provider that an HSR needs to be renewed." *Id.*

C.    Legal Analysis

The undersigned stated the standard for medical deliberate indifference above and incorporates it here. *Supra* pp. 19–21. Judging the evidence against this standard, a reasonable juror could only conclude that the subject Defendants' alleged discontinuance of the prescriptions and HSR did not violate the Eighth Amendment. The evidence shows that: (1) Plaintiff's betamethasone and hydrocortisone expired in late October 2018; and (2) Plaintiff's HSR expired in early January 2019. *See* Dkt. 43 at 258, 266. But a policy that requires prisoners

1    to request renewal of self-administered prescriptions does not, without more, suggest deliberate

2    indifference.

3          Granted, there were delays of approximately three months and one month between when,

4    respectively, the prescriptions and HSR expired and when Defendant Dr. Kenney renewed them.

5    However, without more, these delays do not support a reasonable finding that the subject

6    Defendants deliberately disregarded Plaintiff's medical needs. The Court notes that Plaintiff

7    sought to renew the prescriptions and HSR close to their expiration. *See* Dkt. 43 at 258–59, 266.

8    Furthermore, in the above grievance response, the assistant secretary attributed the delay in part

9    to prescheduled, off-site medical appointments. Plaintiff has not disputed this assertion, and

10   evidence supports it. *See* Dkt. 43 at 198 (medical records showing that Plaintiff received an off-

11   site ultrasound on January 15, 2019); Dkt. 38-6 at 19 (Defendant Dr. Kenney's stating that

12   Plaintiff received an "upper endoscopy biopsy" on January 28, 2019).[11] Given the proximity of

13   Plaintiff's renewal requests to the expiration of the prescriptions and HSR and the existence of

14   prescheduled, off-site appointments, these delays at most reflect an "inadvertent [or negligent]

15   failure to provide [timely] medical care." *See Jett*, 439 F.3d at 1096 (citation omitted). Such

16   unintentional delays do not offend the Eighth Amendment. *See id.*

17         It is not fully clear whether Defendant Dr. Kenney renewed Plaintiff's prescription for

18   flunisolide nasal spray or whether he had such a prescription in late 2018/early 2019. As

19   recounted above, on January 6, 2019, Plaintiff requested a refill of "Fluocinonide 0.05%," a

20   topical corticosteroid. Furthermore, a medical record from March 2014 states that Plaintiff was

21   receiving "Fluocinonide nasal" and that he used this medication at times for a scalp condition.

22

23         [11] Plaintiff has not disputed Dr. Kenney's statement and the record supports it. *See* Dkt.

24   43 at 341.

1   *Reed I*, Dkt. 51-1 at 8. Additionally, Plaintiff saw an ENT in September 2019. Dkt. 45 at 17–18;

2   Dkt. 43 at 193. The ENT noted that Plaintiff had "been on topical basal steroids for the last few

3   months," which helped with nasal congestion. Dkt. 43 at 194. Coupled with the above evidence,

4   this observation impels the inference that Dr. Kenney prescribed fluocinonide 0.05% as he

5   requested.

6          However, both Plaintiff and Defendant Dr. Kenney state that Plaintiff had a prescription

7   for flunisolide nasal spray that expired in late 2018/early 2019. Given the summary judgment

8   posture, the Court further finds that Plaintiff had a prescription for flunisolide that expired in late

9   2018/early 2019. Likewise, despite Defendant Dr. Kenney's contrary contention, the Court finds

10  that he did not renew Plaintiff's flunisolide.

11         Given these findings, a reasonable juror could only conclude that the subject Defendants

12  were not deliberately indifferent to Plaintiff's medical needs. The record conclusively shows

13  that, after a delay attributable at most to inadvertence or negligence, Defendant Dr. Kenney saw

14  Plaintiff and renewed certain prescriptions and the HSR, including Fluocinonide 0.05%.

15  Furthermore, the ENT noted that Plaintiff's topical steroids had helped with nasal congestion,

16  Dkt. 43 at 194, which Plaintiff alleges was a symptom of his EE, *see* Dkt. 5 at 11. So, even if

17  Defendant Dr. Kenney did not prescribe Plaintiff flunisolide nasal spray, a reasonable juror could

18  only conclude that he did not callously disregard Plaintiff's EE symptoms.[12]

19         Plaintiff essentially contends that Defendant Dr. Kenney should have prescribed him

20  flunisolide because: (1) the CRC prescribed it in 2011; and (2) the ENT prescribed it in

21  September 2019. *See* Dkt. 45 at 17. However, there is no evidence supporting a reasonable

22

23  ────────────────

24  [12] That Defendant Dr. Herrington referred Plaintiff to an ENT further supports this finding. *See Estelle*, 429 U.S. at 107.

1    finding that the CRC's 2011 decision *bound* Defendant Dr. Kenney in late 2018/early 2019. *Cf.*

2    Dkt. 38-6 at 19–20; Dkt. 43 at 337. Furthermore, the ENT did not diagnose Plaintiff with EE.

3    Rather, the ENT diagnosed Plaintiff with a chronic cough. Dkt. 43 at 195. The ENT merely

4    noted that there was "some sort of record that suggest[ed EE]." *See id.* In any event, Plaintiff at

5    best describes a difference of medical opinion, which is not deliberate indifference.

6        Plaintiff also contends that his 2008 and 2011 EE diagnoses were missing from his

7    medical file and attributes his delay in receiving flunisolide to this omission. *See* Dkt. 45 at 17.

8    But, assuming his allegations are true, Plaintiff: (1) was receiving flunisolide before it expired in

9    late 2018/early 2019; and (2) learned in May 2019 that his prior EE diagnoses were missing from

10   his medical file. *See, e.g.*, *id.* These allegations contradict the assertion that possession of his

11   previous EE diagnoses was necessary to be prescribed flunisolide. In any event, no evidence

12   indicates that Plaintiff's medical records were intentionally removed from his medical file.

13   Likewise, no evidence indicates that the person who removed the records (or failed to ensure

14   their inclusion) drew the inference that their absence would cause delays in Plaintiff's receiving

15   medication, much less that these delays would (allegedly) harm him. *See Farmer*, 511 U.S. at

16   837. Again, at best, Plaintiff describes negligence, not deliberate indifference.[13]

17

18   _____

19       [13] Defendant Dr. Herrington was not involved in the events at issue other than to refer
     Plaintiff to an ENT as Plaintiff requested. *See* Dkt. 38-2 at 14–5, 17–18; Dkt. 38-6 at 20.
20   Likewise, Defendant Taylor's only involvement was to investigate Plaintiff's grievance. *See* Dkt.
     43 at 339. Similarly, they both state that they were not tasked with renewing the prescriptions
21   and HSR. *See* Dkt. 38-2 at 4, 14–5, 17–18; Dkt. 38-7 at 3. So no reasonable juror could conclude
     they were personally involved in the alleged constitutional violation at issue. *See Ashcroft v.*
22   *Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits,
     a plaintiff must plead that each Government-official defendant, through the official's own
23   individual actions, has violated the Constitution"); *see also Johnson v. Duffy*, 588 F.2d 740, 743
     (9th Cir. 1978). Likewise, there is no reasonable basis on which to conclude that they
24   "responsible for" the delays at issue, further precluding a deliberate indifference claim against
     them. *See McGuckin*, 974 F.2d at 1062.

1    In sum, assuming that each subject Defendant was personally involved in the delays at

2    issue, no reasonable juror could conclude that he was deliberately indifferent to Plaintiff's

3    medical needs. Consequently, summary judgment should be granted to Defendants on Plaintiff's

4    medical deliberate indifference claim alleged in Counts 4–7, 15.

5    **III.    Counts 8–14 and 16–18: Medical Deliberate Indifference (Alleged Against**

6    **Defendants Neibert, Herrington, Taylor, and Kenney)[14]**

7    Plaintiff alleges that these Defendants "failed to properly make, maintain, [and] organize

8    medical records." Dkt. 23 at 3 (citation omitted); *see also* Dkt. 5. at 12–23. To support this claim,

9    Plaintiff cites several instances in which his medical records were allegedly improperly made,

10   maintained, and/or organized in violation of various DOC policies and procedures. For example:

11        •    Plaintiff notes that a June 5, 2015 Hepatitis C Treatment Eligibility Evaluation

12   form is incomplete. Dkt. 43 at 228–233.

13        •    Plaintiff notes that the Problem List/Surveillance form was not being updated.

14   Dkt. 45 at 19 (citing Dkt. 43 at 225–26).

15        •    Plaintiff notes that the June 26, 2019 CRC Report is incomplete. Dkt. 45 at 20

16   (citing Dkt. 43 at 220–21).

17        •    Plaintiff contends that his October 1, 2015 Hepatitis C Treatment History and

18   Physical form is incomplete. *Reed I*, Dkt. 42-1 at 62–64.

19        •    Plaintiff contends that his Primary Encounter Reports were not filled out properly.

20   Dkt. 45 at 18; *see also* Dkt. 43 at 236–38. In support, he states that "[t]here are no updated

21

22   ─────────────────

23        [14] Plaintiff also asserts this claim against Defendants Dr. Kariko and Nurse Eschbach in
     his declaration. *See, e.g.*, Dkt. 45 at 15. However, any claim against them would fail for the same
24   reasons that his claim against the named Defendants fails.

1    Progress, Procedure Notes, or Medical Notes outlining the Reason for Visit, History of Present

2    Illness, Past Medical History, Family History, Social History, Physical Examination, and

3    Assessment and Health Plan." Dkt. 45 at 18–19 (citing *Reed I*, Dkt. 51 at 99–124).

4        •    Plaintiff contends that certain treatment notes are illegible. Dkt. 45 at 21 (citing

5    Dkt. 43 at 212–18).

6        •    Plaintiff states that these "omissions attributed to [his] suffering years of

7    unnecessary wanton pain relative to headaches, dizziness, tinnitus, blurred vision, fatigue,

8    prediabetes, with an ongoing exposure to conditions that pose an excessive risk of serious

9    damage to [his] future health." *Id.* at 16.

10        The undersigned stated the standard for medical deliberate indifference above and

11    incorporates it here. *Supra* pp. 19–21. Judging the summary judgment record against this

12    standard, a reasonable juror could only conclude that the subject Defendants' alleged failure to

13    keep complete medical records did not violate the Eighth Amendment. No evidence supports a

14    reasonable finding that these Defendants drew the inference that this alleged failure posed a

15    substantial risk of harm to Plaintiff. *See Farmer*, 511 U.S. at 837. Likewise, no evidence

16    supports a reasonable finding that this alleged failure caused any harmful delays in Plaintiff's

17    medical treatment. *See Morgan*, 296 F.3d at 746. Plaintiff's core allegation that his documents

18    lack "[]sufficient medical information critically necessary for making an accurate determination

19    [of his] serious medical needs" is unsupported and conclusory. *See* Dkt. 45 at 26. No evidence

20

21

22

23

24

1    supports a reasonable finding that, due to these alleged deficiencies, Plaintiff's providers could

2    not accurately determine his medical needs.[15]

3            Plaintiff also stresses that the subject Defendants violated various provisions of the

4    HIMP. Dkt. 41 at 25; Dkt. 45 at 15–32. However, "state departmental regulations do not

5    establish a federal constitutional violation." *Cousins v. Lockyer*, 568 F.3d 1063, 1070 (9th Cir.

6    2009); *see also Williams v. Banks*, 956 F.3d 808, 812 (5th Cir. 2020) ("Our case law is clear that

7    a prison official's failure to follow the prison's own policies, procedures, or regulations does not

8    constitute a violation of the Eighth . . . Amendment, if constitutional minima are nevertheless

9    met.").

10           Here, a reasonable juror could only conclude that Defendants satisfied the Eighth

11   Amendment standard. To reiterate, Plaintiff has received a variety of medical treatment for a

12   variety of conditions and symptoms over the course of years. Plaintiff also received assistance in

13   locating documents missing from his "voluminous medical records." *See* Dkt. 38-2 at 13; Dkt. 43

14   at 344. A reasonable juror could not find that Defendants deliberately disregarded Plaintiff's

15   medical concerns or that this alleged disregard harmed him. So these alleged technical violations

16   of the HIMP do not offend the Eighth Amendment.

17           In Count 9, Plaintiff alleges that, in May 2019, he was not "reevaluated" for EE "because

18   there was no documentation" of its diagnosis. Dkt. 5 at 13. He adds that he was not prescribed

19

20   ───────────────

21           [15] Dr. Gish testified that the Hepatitis C Treatment Evaluation Form he saw was
     incomplete, which is not in dispute. *See* Dkt. 43 at 228–233, 271, 295. However, his testimony
22   does not link this omission to any negative health outcome. *See id.* at 271, 295. Dr. Gish also
     faulted Plaintiff's medical providers for not conducting certain tests and procedures. *See id.* at
23   290, 292. However, he was not referring to medical forms that Plaintiff's providers allegedly
     failed to make, maintain, and/or organize. *See id.* Rather, he was stating his opinion that
24   Plaintiff's HCV treatment did not meet the standard of care. *See id.*

1  flunisolide until September 2019. *Id.* at 14. The Court already addressed these allegations above

2  and concluded that they presented no genuine issues for trial.

3       In sum, no reasonable juror could conclude that the subject Defendants' alleged failure

4  to make, maintain, and/or organize Plaintiff's medical records constituted deliberate indifference.

5  As a result, summary judgment should be granted to Defendants on Plaintiff's medical deliberate

6  indifference claim alleged in Counts 8–14 and 16–18.

7                              **RETALIATION—COUNT 19[16]**

8       Plaintiff alleges that the subject Defendants retaliated against him. Dkt. 5 at 23–24. In

9  support, he repeats his allegation that they failed to keep complete medical records and contends

10 they so acted because he filed a grievance on January 21, 2016 complaining about the CRC's

11 denial of treatment that month. *See id.* at 23–24; *see also Reed I*, Dkt. 8 at 9–11.

12      "Within the prison context, a viable claim of First Amendment retaliation entails five basic

13 elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because

14 of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his

15 First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional

16 goal." *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005) (citations omitted).

17      The First Amendment protects a prisoner's right "to file prison grievances," and to "pursue

18 civil rights litigation in the courts." *Id.* at 567 (citations and internal quotation marks omitted).

19 Adverse action has a chilling effect on the prisoner's First Amendment rights if the "official's acts

20 would chill or silence a person of ordinary firmness from future First Amendment activities."

21

22 _____

23     [16] Plaintiff alleges this claim against Defendants Dr. Kenney, Dr. Herrington, and Taylor.
   Any retaliation claim against any other Defendant would fail for the same reasons that Plaintiff's

24 claim against the subject Defendants fails.

1    *Robinson*, 408 F.3d at 568 (internal quotation marks and emphasis omitted). "A plaintiff who fails

2    to allege a chilling effect may still state a claim if he alleges he suffered some other harm that is

3    more than minimal." *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012) (alteration adopted)

4    (citations and internal quotation marks omitted).

5          Regarding causation, "the plaintiff must allege a causal connection between the adverse

6    action and the protected conduct." *Id.* "Direct evidence of retaliatory intent" or "a chronology of

7    events from which retaliation can be inferred" may demonstrate the requisite causal connection.

8    *See id.* (citations omitted). For temporal proximity between the protected activity and adverse

9    action to prove causation, the proximity must be "very close." *See Clark Cty. Sch. Dist. v. Breeden*,

10   532 U.S. 268, 273 (2001) (citation and internal quotation marks omitted). For instance, temporal

11   proximity of three months is insufficient to show causation. *See id.* (citation omitted); *Keyser v.*

12   *Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 752 (9th Cir. 2001) (citation omitted).

13         Here, a reasonable juror could not conclude that the subject Defendants' alleged failure to

14   keep proper medical records would chill or silence a person of ordinary firmness from engaging in

15   protected activity. As discussed, the record does not support a reasonable finding that these alleged

16   deficiencies meaningfully interfered with Plaintiff's medical care or harmed him. Likewise, it is

17   unreasonable to infer that the mere prospect that prison officials would fail to keep complete

18   medical records would deter a person of ordinary firmness from complaining about the same. True,

19   Plaintiff was diagnosed with HCV and other conditions and had an extensive medical history.

20   Also, the Court recognizes the general importance of "keeping [adequate] medical records." *See*

21   *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1055 (8th Cir. 1989). However, absent more, these facts

22   do not support a reasonable finding that the deficiencies at issue would cause an ordinarily firm

23   person to believe the deficiencies would meaningfully interfere with his or her health care.

24

1    Plaintiff overstates the breadth of the subject Defendants' alleged failure to keep adequate

2    medical records. For instance, Plaintiff contends that certain forms are incomplete. Dkt. 45 at 18–

3    19. However, on their face, the reports contain considerable medical information. *See, e.g.*, Dkt. 43

4    at 236–38; *Reed I*, Dkt. 42-1 at 62–64. Plaintiff also contends that certain treatment notes are

5    illegible. Dkt. 45 at 21. But the Court reviewed them and found them to be largely legible. *See*

6    Dkt. 43 at 212–18. Indeed, the Court transcribed Defendant Dr. Kenney's February 5, 2019

7    treatment note in full. *Supra* p. 26. Granted, other records Plaintiff cites ostensibly contain less

8    information. *See, e.g.*, Dkt. 43 at 220–21, 225–26, 228–233. Again, however, there are no facts

9    supporting a reasonable finding that these deficiencies meaningfully interfered with Plaintiff's

10   health care. Plaintiff essentially asks this Court to find that the mere technical violation of DOC

11   policies and procedures regarding the keeping of medical records would dissuade an ordinarily

12   firm prisoner from engaging in protected activity. But, without more, no reasonable juror could

13   so conclude.[17]

14        Even if a reasonable juror could so conclude, a reasonable juror could not conclude that

15   Plaintiff's January 21, 2016 complaint caused these actions/omissions. Plaintiff has not

16   submitted any direct evidence of retaliatory intent. Plaintiff appears to rely on temporal

17   proximity between that complaint and the alleged retaliation to establish the link. *See* Dkt. 41 at

18   16. However, the timing of these actions/omissions does not support this argument. For instance,

19   some of the allegedly deficient forms were created in 2015—before Plaintiff grieved the CRC's

20

21

22        [17] That Plaintiff "continued to file a stream of complaints in kites [and grievances after
     January 2016] on his alleged lack of medical care" further undercuts the assertion that the subject
23   Defendants' alleged failure to keep proper medical records was an adverse action. *See Sealey v.
     Busichio*, 696 F. App'x 779, 781 (9th Cir. 2017); *see also* Dkt. 43 at 244–66, 320–49; *Reed I*,
     Dkt. 51 at 94–96.

24

1    decision. Dkt. 43 at 228–33; *Reed I*, Dkt. 42-1 at 62–64. Others were not created "very close" to

2    January 21, 2016. For instance, even though Plaintiff asserts that certain CRC and Primary

3    Encounter Reports are deficient, the forms at issue were created in 2019. Dkt. 43 at 220–21,

4    236–38. The timing of other documents further weakens any inference of causation. Plaintiff

5    contends that the Problem List/Surveillance form was not being updated. Dkt. 45 at 19 (citation

6    omitted). However, it was updated on February 10, 2016. Dkt. 43 at 225–26. That the form was

7    updated roughly three weeks after Plaintiff grieved the CRC's decision is inconsistent with the

8    contention that forms were not being updated after January 21, 2016. Moreover, Plaintiff

9    contends that certain treatment notes are illegible. Dkt. 45 at 21 (citation omitted). But one is

10    dated 2008 and the others are dated 2017 and after. Dkt. 43 at 212–18. Again, these observations

11    undercut the argument that the subject Defendants started keeping inadequate medical records

12    closely after January 21, 2016. Accordingly, no reasonable juror could conclude that Plaintiff's

13    protected activity caused the subject Defendants' alleged failure to keep proper medical records.

14        In sum, a reasonable juror could not conclude that the subject Defendants retaliated

15    against Plaintiff. So summary judgment should be granted to Defendants on Plaintiff's retaliation

16    claim.

17                                    **STATE LAW CLAIMS**

18        For the first three groups of Counts (1–18), Plaintiff also asserts state-law claims for

19    medical malpractice, medical negligence, and violations of the OHP, HIMP, and Wash. Admin.

20    Code § 137-91-010. *See, e.g.*, Dkt 5 at 5, 24–25.

21        Because Plaintiff's state law claims have a "common nucleus of operative fact with the

22    federal claims and the state and federal claims would normally be tried together," the Court has

23

24

1    supplemental jurisdiction over the state-law claims. *See Bahrampour v. Lampert*, 356 F.3d 969,

2    978 (9th Cir. 2004) (citation and internal quotation marks omitted).

3        However, the Court has discretion to dismiss the supplemental state law claims. *Acri v.*

4    *Varian Assocs., Inc.*, 114 F.3d 999, 1000 (9th Cir. 1997). "[I]n the usual case in which all

5    federal-law claims are eliminated before trial, the balance of factors to be considered under the

6    pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point

7    toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon*

8    *Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also United Mine Workers of Am. v. Gibbs*,

9    383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even

10   though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.");

11   *Trustees of Constr. Indus. & Laborers Health & Welfare Tr. v. Desert Valley Landscape &*

12   *Maint., Inc.*, 333 F.3d 923, 926 (9th Cir. 2003) ("[O]ur cases upholding the exercise of discretion

13   under [28 U.S.C.] § 1367(c)(3) have all involved dismissals for failure to state a claim or a grant

14   of summary judgment to the defendant on the federal claim." (citations omitted)).

15       Here, the Court should decline to exercise supplemental jurisdiction over Plaintiff's state

16   law claims. The Court has dismissed all of Plaintiff's § 1983 claims and recognizes the policy of

17   avoiding "[n]eedless decisions of state law." *See Gibbs*, 383 U.S. at 726. Furthermore, declining

18   to exercise supplemental jurisdiction over the state law claims promotes judicial economy and

19   fairness because the Parties did not adequately address these claims in their briefs and associated

20   filings. In these circumstances, the interests in comity, judicial economy, and fairness strongly

21   outweigh any potential inconvenience the Parties may experience if the Court dismisses the state

22   law claims without prejudice.

23

24

1

**CONCLUSION**

2 As discussed above, it is recommended that Defendants' motion for summary judgment

3 (Dkt. 37) be **GRANTED**, with the result that the Court should **grant summary judgment** to

4 Defendants on Plaintiff's federal claims and **dismiss without prejudice** Plaintiff's state law

5 claims.

6 Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the Parties shall have

7 fourteen (14) days from service of this report to file written objections. *See also* Fed. R. Civ. P.

8 6. Failure to file objections will result in a waiver of those objections for purposes of *de novo*

9 review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a result in a waiver

10 of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985);

11 *Miranda v. Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating

12 the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on

13 **January 28, 2022** as noted in the caption.

14 Dated this 10th day of January, 2022.

15

16

David W. Christel

17 United States Magistrate Judge

18

19

20

21

22

23

24